**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TSI, Incorporated, a Minnesota Corporation,<br><br>Plaintiff,<br><br>v.<br><br>Azbil BioVigilant, Inc., a Delaware Corporation,<br><br>Defendant. | No. CV12-0083-PHX-DGC<br><br>**ORDER** |

The Court held a *Markman* hearing on March 18, 2013. This order will set forth the Court's rulings.

A.

Plaintiff TSI, Incorporated asks the Court to construe two phrases from Claims 1, 17, and 20 of the '279 Patent: "operative to excite biomolecules contained therein to produce fluorescence," and "so as to excite biomolecules contained in a contacted particle to produce fluorescence." Doc 101-1 at 30, 31. TSI asks the Court to construe the first phrase to mean "operative to excite intrinsically fluorescing biological molecules native to the contacted particles to produce fluorescence," and the second phrase to mean "so as to excite intrinsically fluorescing biological molecules native to a contacted particle to produce fluorescence." The Court agrees with TSI's proposed construction.

Claim 1 includes "a solid state excitation source" that contacts "particles or the particle population" and "is operative to excite *biomolecules contained therein* to produce fluorescence." *Id*. at 30 (emphasis added). This statement makes clear that the

biomolecules are contained within the particles contacted by the light source. The language cannot reasonably be read to include a biomolecule or other substance outside of the particle or a non-biomolecule artificially introduced into the particle. Nothing in the claim language or the specification suggests such artificial introduction. Thus, the Court concludes that the claim clearly refers to biomolecules that naturally are contained within the particle contacted by the light source. Claim 17 contains virtually identical language. *Id.* Claim 20 is even more specific, referring to "biomolecules contained in a contacted particle." *Id*. at 31.

Other language in the '279 Patent supports this conclusion. Language in the background section explains that a light source is used to detect "a specific biomolecule present only in bio-viable particles." *Id*. at 23. The use of the word "only" suggests that the patent applies to biomolecules naturally occurring with such particles, not biomolecules artificially introduced into such particles and therefore not "present only" in the particles. The background section goes on to discuss a biomolecule, NADP, that is contained in "[m]ost living cells." This reference, and the language that follows, clearly shows that the biomolecule occurs naturally within the living cells.

The patent later refers to use of a laser to "detect biomolecules *in* particles of interest." *Id*. at 29 (emphasis added). This reference, and various references to "intrinsic fluorescence" in particles, again confirms that the patent is focusing on biomolecules already contained within particles of interest. *Id*.

Finally, the '279 patent specifically incorporates the '012 Patent. *Id*. at 2. The '012 Patent, in turn, clearly teaches away from tagging, stating that "fluorescent tagging is not practical for aerosol sampling as one cannot tag all the incoming airborne particles on a real-time basis." Doc. 101-3 at 12. The '012 Patent further states that "[t]he invention arises from the discovery that a single particle, compromising one or more biological cells, bacteria or spores, contains sufficient intrinsically fluorescing biological matter (biomolecules) to enable one to establish whether the particle is viable (biologically alive), and thus potentially hazardous." *Id.* at 12-13. This statement,

consistently with the other statements discussed above, clearly shows that the excited biomolecules at issue in both patents are those naturally occurring within biological matter and that fluoresce upon contact with a laser.

Thus, the Court construes the disputed language in Claims 1 and 17 to mean "operative to excite intrinsically fluorescing biological molecules native to the contacted particles to produce fluorescence." The Court construes the language at issue in Claim 20 to mean "so as to excite intrinsically fluorescing biological molecules native to a contacted particle to produce fluorescence."

B.

Defendant Azbil Bio Vigilant, Inc. ("BioVigilant") argues that several phrases in Claims 1, 17, and 20 – "viable biological particles," "biologically viable … particles," "biologically viable particle," and "particle is biologically viable" – should be construed to mean "biologically alive" particles. TSI argues that no construction of these phrases is necessary. Similarly, BioVigilant argues that the phrases "biologically inert particles" and "inert particle" in these same claims mean particles that are "not biologically alive." TSI again argues that no construction is necessary.

The discussion at the *Markman* hearing made clear that construction of these terms is necessary. The parties vigorously disagree on the meaning of "viable" and its corollary "inert." The parties intend to make various arguments to the jury depending on how these words are construed. Thus, the Court cannot accept TSI's argument that no construction is necessary because these phrases will not be at issue during trial.

Nor can the Court accept TSI's suggestion that these phrases be construed at the close of trial. Claim construction is necessary for the parties to produce relevant expert reports, file relevant motions for summary judgment, and prepare relevant evidence and arguments for trial. Moreover, claim construction must be based on the intrinsic evidence of the patent, as well as such extrinsic evidence as is appropriate under Federal Circuit case law. The largely factual and opinion testimony to be given at trial will not necessarily shed light on this claim-construction task.

The Court agrees with BioVigilant's proposed construction. Indeed, TSI has not produced an alternative construction of the words "viable" and "inert." TSI instead urges the Court to make no construction.

Language from the '279 Patent makes clear that references to "viable biological particles" mean living biological particles. The background section states that intrinsic fluorescence of biological matter can be used "to enable one to establish whether the particle was viable (biologically alive), and thus potentially hazardous." Doc. 101-1 at 23. The example section states that "[t]he rate of increase of fluorescence using the Nichia laser roughly paralleled that of live particles." *Id*. at 27. Statements by the inventor of the '279 Patent and TSI's expert similarly equate viable particles with living particles. *See* Docs. 99-8 at ¶ 44, 99-9 at ¶ 4.

The language in Claims 1, 17, and 20 also make clear that an inert particle is the opposite of a viable particle – the patent uses a microprocessor to make comparisons and establish "whether that particle is a biologically viable particle or an inert particle." *Id*. at 30, 31. If a viable particle is an alive particle, then an inert particle would be one that is not alive. This interpretation is consistent with TSI's repeated reference to inert particles as dust, engine exhaust, and water droplets. *See* Docs. 99-8 at ¶ 45, 99-9 at ¶ 5.

The Court construes "viable" in Claims 1, 17, and 20 as meaning "alive." The Court construes the word "inert" in those claims as meaning "not alive."

C.

Claim 1 of the '279 Patent includes "a photon counter for measuring the intensity of fluorescence emitted from each contacted particle and producing a signal indicative thereof." *Id*. at 30. Claim 18 states that "the intensity measuring means comprise a photon counter." *Id*. TSI contends that the phrase "photon counter" should be construed to mean "a photon detector such as a PMT." BioVigilant asserts that "photon counter" should be construed as a "device that counts photons."

Words of a claim are generally given their ordinary and customary meaning, which is the meaning the term would have to a person of ordinary skill in the pertinent art

at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). The ordinary and customary meaning of the word "counter" is something that counts. A "photon counter," therefore, would be something that counts photons.

In support of its argument that the phrase "photon counter" is not limited to a device that counts photons, TSI points to the following sentence in the '279 patent: "Fluorescence is detected using a photon counter such as a PMT." Doc. 101-1 at 25. The parties appear to agree that a PMT is a photomultiplier tube, and that some PMTs count photons while others do not. TSI argues that the '279 Patent, by identifying a PMT as a type of "photon counter," makes clear that a photon counter can be a device that counts photons or a device that does not. Given that some types of PMTs count photons, however, a more natural meaning of the phrase is that photon-counting PMTs are an example of a kind of "photon counter" described in the patent. Stated differently, the key phrase to be construed – "photon counter" – has a plain and ordinary meaning that is not altered by reference to an example – "such as a PMT" – that itself can be configured to count photons.

TSI argues that the very next sentence in the '279 Patent refers to "the Ho Patents," a reference to, among others, the '012 Patent that in turn makes clear that photon-counting and non-photon-counting devices can be used. Doc. 101-3 at 7-15. But when the relevant diagram in the '012 Patent distinguishes between photon-counting devices and non-photon-counting devices, it refers to them, respectively, as a "photon counter" and an "integrator for amplitude." *Id*. at 7, Fig. 6. Thus, the phrase "photon counter" in the '012 Patent appears to mean a device that counts photons. Although the text expands on the phrase by referring to a "photon pulse counter" (*Id*. at 15), the '012 Patent does not clearly suggest that the phrase "photon counter" also applies to non-photon-counting devices.

TSI argues that the use of a "photon counter" described in Claim 1 is "for measuring the intensity of fluorescence emitted from each contacted particle." Doc. 101-

1 at 30. TSI agreed at the *Markman* hearing, however, that a photon-counting device does just that. Thus, the fact that the device is to be used for measuring the intensity of fluorescence does not make clear that the "photon counter" referred to does something other than count photons.

Finally, the Court notes that the '279 Patent, in Claim 20, refers to a "*detector* to measure the intensity of fluorescence from the contacted particle." *Id*. at 31 (emphasis added). Thus, the authors of the '279 patent were familiar with the word "detector" and used it in one of the specific claims. The fact that the authors chose not to use the word in the phrase "photon counter" appearing in Claims 1 and 17 must be regarded as a deliberate choice that argues against TSI's construction of "photon counter" as a "photon detector" such as a PMT.

The Court construes the phrase "photon counter" in Claims 1 and 18 to mean "a device that counts photons."

D.

Claim 17 of the '279 Patent includes a "means for measuring the intensity of fluorescence emitted from each particle and producing a signal indicative thereof." *Id.* at 30. The parties agree that this term is a means-plus-function term governed by 35 U.S.C. § 112 ¶ 6. The parties also agree that the function associated with this term is "measuring the intensity of florescence emitted from each particle and producing a signal indicative thereof," but disagree as to the corresponding structure for this term. TSI argues that the corresponding structure is "a photon detector such as a PMT, and equivalents thereof." BioVigilant contends that the corresponding structure is "a photo-multiplier tube configured to count photons." For the reasons described above with respect to the phrase "photon counter," the Court agrees with BioVigilant.

E.

BioVigilant claims that several phrases in the '279 Patent are indefinite. To prevail on this argument, BioVigilant must present clear and convincing evidence that the phrases are not amenable to construction or are insolubly ambiguous. *Haemonetics Corp.*

*v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010).

BioVigilant claims that "means for comparing" in Claim 17 is indefinite because, although the '279 Patent clearly refers to a microprocessor, it fails to disclose the algorithm that would be used by the microprocessor. The Court does not agree. The algorithm in a patent may be expressed in any understandable terms including a mathematical formula, prose, a flow chart, or in any other manner that provides sufficient structure. *Typhoon Touch Technologies, Inc. v. Dell, Inc.*, 659 F.3d 1376, 1383 (Fed. Cir. 2011). The patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function. *Id*.

The description in the '279 Patent satisfies this requirement. Claim 17 states that the required "means" is used to compare each particle's fluorescence intensity signal against predetermined criteria. Thus, the microprocessor is to compare the intensity of the signal received from the photon counter against predetermined criteria such as the background. Claim 17 goes on to say that the microprocessor thereby establishes "whether that particle is a biologically viable or an inert particle." *Id*. at 30. This determination obviously is made on the basis of whether the measured signal is greater than or equal to the predetermined value.

The process is explained in greater detail earlier in the '279 Patent: "a microprocessor compared each contacted particle's fluorescent intensity signal against predetermined criteria for establishing whether that particle is a biologically viable particle or an inert particle." *Id*. at 25. This is not a complicated process. Two values are compared, and the device reports whether one value exceeds the other. A person of ordinary learning in the field could readily write computer code to accomplish this function. BioVigilant has not shown by clear and convincing evidence that the "means for comparing" in Claim 17 is indefinite.

BioVigilant also argues that the reference to "a wavelength above about 320 nm" in Claims 1 and 17 is indefinite. The Court does not agree. The phrase clearly specifies wavelengths above 320 nm, and the word "about" merely recognizes that the precise

wavelength of the laser may vary somewhere around 320 nm. BioVigilant argues that the phrase has no upper bound, but the sentence goes on to say that the laser must be "operative to excite biomolecules contained therein to produce fluorescence." *Id*. at 30. Thus, the entire phrase refers to a laser with a wavelength above approximately 320 nm and within the range sufficient to excite biomolecules to produce fluorescence. BioVigilant has not shown by clear and convincing evidence that this phrase is indefinite.

Finally, BioVigilant argues that the phrase "contacting the laser beam and particles of the population" in Claim 20 is indefinite. *Id*. at 31. Again, the Court does not find that BioVigilant has met its burden of proof. The very next phrase in Claim 20 refers to "the intensity of fluorescence from the contacted particle." *Id*. It is evident from this phrase, and from the context of Claim 20 and the '279 Patent generally, that the claim is referring to particles in the relevant population that fluoresce after being contacted by the laser beam. BioVigilant has not shown by clear and convincing evidence that the phrase in question is indefinite.

Dated this 19th day of March, 2013.

_____
David G. Campbell
United States District Judge